**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 13-cv-01715-RM-NYW

DOUGLAS BAILEY,

      Plaintiff,

v.

CITY OF ENGLEWOOD,

      Defendant.

---

### ORDER

---

Plaintiff Douglas Bailey seeks to hold his former employer, the City of Englewood (the "City"), liable under the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq*. (the "ADA"), for firing him based on his alleged disability.   Before the Court is the City's Motion for Summary Judgment.   (ECF No. 103.)   For the reasons stated below, the Court GRANTS the City's motion.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).   "Under Rule

56(c), the moving party[] *always* bears the initial responsibility of informing the district court of the basis for its motion . . . ."  *Reed v. Bennet*, 312 F.3d 1190, 1994 (10th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).   However, the moving party "can satisfy that burden with respect to an issue on which it does not bear the burden of persuasion at trial simply by indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).   Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial.   *See id.*   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.   *Anderson*, 477 U.S. at 248.   In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party.   *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

If a movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in her complaint, but must respond with specific facts showing a genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id*. The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and citation omitted). The Court is "not obligated to comb the record in order to make [Plaintiff's] arguments for [her]." *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000). Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall include the specific page or statutory subsection to which reference is made." D.C. Colo. L. Civ. R. 7.1(e).

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts as recited below are based on adequate citations to the record which would be admissible at trial. The facts are recited in a light most favorable to the non-moving party.

Plaintiff was employed as a fire fighter and paramedic by the Englewood Fire Department

(the "Fire Department") from September 9, 2006 through December 8, 2011.   (ECF No. 27, Compl. at ¶ 7.)   A document created by the Fire Department listing the job duties of fire fighters and paramedics states that, for both positions, an employee is expected to perform the following "[e]ssential [d]uties," among others: (1) respond to fire and emergency calls as a member of an engine company, truck company or rescue company; (2) perform advanced life support functions for the sick and injured; and (3) maintain the fire station, station equipment, advanced life support equipment, required drugs and sign-off sheets.   (ECF No. 103-3, City of Englewood Position Description at 1-2.)

In the Spring of 2009, Plaintiff injured his back on the job and underwent spinal surgery in July, 2009.   (ECF No. 27 at ¶ 8.)   Plaintiff was assigned to light duty following his surgery and worked out of the Fire Marshal's office.   (*Id.*)   Beginning around September, 2009, while still under rehabilitation from surgery, Plaintiff began to experience depression.   Shortly thereafter, Plaintiff informed Assistant Fire Marshal Marla Wilcox as well as Fire Marshal Ben Greene of his depression.   (*Id.* at ¶ 10.)   Plaintiff was later diagnosed with situational depression and was prescribed medication.   Plaintiff then met with Paramedic Coordinator Steve Greene to inform him of this diagnosis and to request a restructuring of his daily work routine, including additional duties to accommodate his disability.   (*Id.* at ¶12.)   Plaintiff's physician cleared Plaintiff to return to regular duty around this same time.   (*Id.*; *see also* ECF No. 103-17, Apr. 6, 2011 Kresin Correspondence.)

There are three shifts of fire fighters and paramedics at the Fire Deparment: the A-Shift, B-Shift and C-Shift.   (ECF No. 103-11, Burley Dep. at 19:21-22.)   Prior to his surgery, Plaintiff

worked in C-Shift.   After he was cycled back into regular duty, Plaintiff was placed into B-Shift by Fire Chief Michael Pattarrozi ("Chief Pattarrozi"), along with two other individuals who were also transferred to B-Shift at that time.   (ECF No. 103-1, Bailey Dep. at 121:7-18.)   Although Plaintiff preferred working in C-Shift, he did not report any issues with his new assignment to B-Shift at the time he was reassigned.   (*Id.* at 122:2-4.)

The Fire Department follows a specific command structure.   (*See* ECF No. 103-2, Petau Aff. at ¶ 4.)   Fire fighters and paramedics are directly supervised by a Lieutenant at each station. (*Id.*)   The lieutenant varies according to the shift and station.   Each shift is supervised by a Battalion Chief.   The Battalion Chief is the direct supervisor for the Lieutenants and a second level supervisor for the firefighters.   The Deputy Fire Chief directly supervises the Battalion Chiefs.   The Fire Chief directly supervises all employees.   (*Id.*)   While he was working in C-Shift, Plaintiff was under the supervision of Battalion Chief Richard Pettau ("Battalion Chief Petau").   (ECF No. 103-1, Bailey Dep. at 74:4-14.)   When Plaintiff began working on B-Shift in 2009, he was directly supervised by Lieutenant Josh Frederick ("Lieutenant Frederick").   (*Id.* at 95:8-13.)   Andy Fox was the Battallion Chief ("Battallion Chief Fox") in charge of B-Shift. (ECF No. 27 at ¶14.)

Following the onset of his depression, Plaintiff was involved in several transgressions of Fire Department rules that led to disciplinary action against him by the Fire Department.

On July 11, 2010, Plaintiff and other fire fighters on his shift were dispatched to a fire. (ECF No. 103-4, Jul. 28, 2010 "Written Corrective Action" Memorandum.)   Upon arriving at the scene of the fire, Plaintiff misplaced his radio and began working without one, a violation of

departmental policy.   (*Id.*)   Plaintiff eventually notified his supervisor, Lt. Frederick, that he did

not have his radio.   (ECF No. 103-1, Bailey Dep. at 116:18-21, 119:9-23.)   At some point, the

safety officer in charge of keeping track of all officers on the scene was unable to locate Plaintiff.

(*Id.* at 104:10-105:3.)   On July 28, 2010, Plaintiff was issued a corrective action letter relating to

this incident.   (ECF No. 103-4, Jul. 28, 2010 "Written Corrective Action" Memorandum.)   The

letter also noted that Plaintiff treated other employees and patients discourteously.   (*Id.*)   At a

meeting between Plaintiff, Battallion Chief Fox and Lt. Frederick to review the letter, Plaintiff

stated that he had experienced some situational depression following his back surgery in 2009 and

that he had sought treatment with the City's Employee Assistance Program.   (ECF No. 103-1,

Bailey Dep. at 106:2-22.)

    In late 2010, Lt. Frederick was transferred to a different station and Lt. Mark Burley

("Lieutenant Burley") became Plaintiff's direct supervisor.   (ECF No. 103-1, Bailey Dep. at

76:3-77:23.)   Sometime after Lt. Burley became Plaintiff's supervisor, Plaintiff complained to

him of "burnout" from working as the attending paramedic and asked if he could work some shifts

as a fire fighter.   (*Id.* at 80:3-25.)   Lt. Burley then assigned Plaintiff to work as a fire fighter for

some, but not all, shifts.   (ECF No. 103-11, Burley Dep. at 115:11-116:1.)   After working with

Plaintiff as a fire fighter, Lt. Burley observed that Plaintiff was unable to do "some basic tasks"

that he was asked to do as a fire fighter.   (*Id.* at 116:2-3, 114:24-115:4.)   Lt. Burley discussed his

concerns with Battallion Chief Fox and others and it was decided that Plaintiff be given the same

probationary evaluation given to new fire fighters to better assess his skills.   (*Id.* at 116.)

Without being given notice that he would be evaluated, Plaintiff was asked to take the

probationary firefighter evaluation in March, 2011.   (*See* ECF No. 103-5, "Remedial Firefighter Skills Check-off, Policy No: 98-02.")   In Lt. Burley's written report of Plaintiff's evaluation, he indicated that although Plaintiff was an experienced fire fighter, he lacked "the knowledge of an entry level firefighter"; Plaintiff's "working knowledge of basic firefighting skills" was "very poor"; Plaintiff was "unclear with his explanations"; the donning and doffing of Plaintiff's fire protective gear was "sloppy"; and that there were "serious concerns [about Plaintiff's] physical fitness level."   (*Id.*)

Plaintiff acknowledged that his performance on this examination was "not up to reasonable standards," (ECF No. 103-1, Bailey Dep. at 132:10-13), and related to Lt. Burley that he suffered from depression in a subsequent meeting between them to review the written evaluation.   (ECF No. 130-5, "Remedial Firefighter Skills Check-off, Policy No: 98-02" at 3; ECF No. 103-11, Burley Dep. at 167:6-8.)   Lt. Burley informed Battalion Chief Fox about Plaintiff's report of depression and Battalion Chief Fox responded by taking Plaintiff to receive a medical evaluation from the City's physician, Dr. Brian Beatty.   (*Id.* at 160:20-25; ECF No. 103-13, Fox. Dep. at 66:1-5.)   After examining Plaintiff, Dr. Beatty completed a report indicating that Plaintiff had "some mild depression," but that he was "placed on medication in January by his personal physician . . . and was feeling much better and is currently having no problems."   (ECF No. 103-6, Mar. 28, 2011 "Fit for Duty Report" at 1.)   Dr. Beatty further noted that Plaintiff's depression was "well controlled with medications."   (*Id.* at 2.)   Following on from Dr. Beatty's evaluation, the City Department of Human Resources provided Plaintiff with a letter on March 30, 2011 to deliver to his personal physician asking for more detail about any restrictions that should be applied to

Plaintiff's employment.   (ECF No. 103-7, Mar. 30, 2011 Correspondence.)   Although Plaintiff

did have one of his physicians complete this letter after several months, he did not provide a copy

of the completed letter to the Fire Department.   (*See* ECF No. 103-14, Eaton Dep. at 45.)

As a result of Plaintiff's evaluation by Lt. Burley, Plaintiff was pulled off regular duty and

assigned remedial training for one month with another fire fighter.   (*See* ECF No. 103-2, Petau

Aff. at ¶ 7.)   Plaintiff was eventually returned to regular duty as a fire fighter and was returned to

his position as a paramedic in August, 2011.   (*Id.* at ¶ 8.)   For the first 30 days following his

reassignment as a paramedic, Plaintiff was placed on the same team as another, more experienced

paramedic, with the intention that he would receive further on-the-job training and evaluation.

(*Id.*)

After receiving this additional training, Plaintiff continued to have issues that were

cataloged by his supervisors.   In August, 2011, shortly after his return to working as a paramedic,

Plaintiff was disciplined for incorrectly inventorying certain narcotics that were carried on the

ambulance he was assigned to.   One of the required job duties of a paramedic was to conduct an

inventory of the drugs on the ambulance at the beginning of each shift.   This included counting

the narcotics such as Fentanyl.   At the beginning of one of his shifts as a paramedic, Plaintiff

signed off on drug inventory sheets counting an incorrect number of Fentanyl vials on his

ambulance.   (ECF No. 103-1, Bailey Dep. at 167:11-22.)   Plaintiff was questioned by Battalion

Chief Fox about his failure to accurately inventory the Fentanyl, and Plaintiff acknowledged his

error.   (*Id.* at 167:16-168:14.)   About a month later, Plaintiff again failed to correctly to account

for the number of vials of Fentanyl on his ambulance.   (*Id.* at 173:4-175:19.)   This error was

8

again discovered by his supervisors and another disciplinary meeting was held with Plaintiff and

Battalion Chief Petau to discuss the error.   (ECF No. 103-2, Petau Aff. at ¶ 9; ECF No. 103-15,

Oct. 13, 2011 Meeting Transcript Excerpt.)   Other paramedics at the Fire Department had

committed this same offense without being subject to disciplinary action.   (*See* ECF No. 114-10,

Oct. 11, 2011 Email.)

During the meeting to discuss Plaintiff's inventory errors, Plaintiff was also asked about

his experience working with B-Shift.   (ECF No. 103-15, Oct. 13, 2011 Meeting Transcript

Excerpt.)   Bailey explained that his co-workers on B-Shift were "overwhelmingly . . . very

supportive" of him.   (*Id.*)   Plaintiff further stated that even though "B-shift is the most

challenging situation for me," he believed that "it's the place where I have the best opportunity for

growth."   (*Id.*)   Plaintiff explained that he originally had intended to ask for a shift change, but

that he had changed his mind and wished to stay with B-Shift.   (*Id.*)

On October 11, 2011, Plaintiff's supervising physician, Dr. Dylan Luyten, withdrew his

approval for Plaintiff to practice as a paramedic, indicating that "it has become apparent that

[Plaintiff] does not possess the experience, knowledge, and skills to function as a paramedic" and

that Plaintiff "has expressed . . . the desire to voluntarily 'step down' from the paramedic role."

(ECF No. 103-9, Dr. Luyten Approval Revocation Letter.)   Because Plaintiff lost this certification

of his supervising physician, Plaintiff was no longer qualified or permitted to work in the capacity

of paramedic.   Dr. Luyten did preserve Plaintiff's status as qualified to operate in the capacity as

an emergency medical technician (EMT), and Plaintiff was still qualified to work as a fire fighter.

(*Id.*)

9

The Fire Department also documented several other instances where Plaintiff allegedly performed below the Fire Department's standards.   In one incident, Plaintiff was instructed to cut the battery cable of the cars involved in an automobile accident to prevent an electrical fire and to prevent the air bags from deploying, yet failed to follow this instruction.   (ECF No. 103-16, Dec. 7, 2011 Meeting Transcript Excerpt at 1-3.)   In another incident, responding to a call to put out a burning Christmas tree that was left in an alley, Plaintiff did not know how to properly operate the water extinguisher to put out the fire, despite repeated directives from Lt. Burley on how to operate it.   (ECF No. 103-11, Burley Dep. at 124:8 – 127:19.)   After returning to the fire station, Plaintiff did not know how to fill the extinguisher back up.   (*Id.*)   On August 26, 2011, Plaintiff failed to recognize that an elderly patient needed immediate intervention.   (ECF No. 103-8, Bailey Performance Documentation at 2-3.)   On September 6, 2011, Plaintiff inappropriately released a diabetic patient about whom he was concerned enough to give medication for later use.   (*Id.* at 2.) On September 8, 2011, it was recorded that Plaintiff's demeanor and attitude was extremely abrasive and argumentative towards an elderly patient and his wife when responding to a call. (*Id.* at 3.)

On November 3, 2011, while Plaintiff was working with C-Shift covering the shift of a co-worker, Plaintiff and others responded to a report of a gas odor emanating from a residential address.   (ECF No. 103-1, Bailey Dep. at 183.)   Plaintiff was asked by the C-Shift Lieutenant, Laura Vetos, to check the gas meter on the house for leaks using a combustible gas detector.   (*Id.* at 184:15- 185:1.)   Plaintiff checked the electric meter, not the gas meter, and reported to Lt. Vetos that the gas meter was not leaking.   (*Id.* at 191:19-192:16.)   Lt. Vetos eventually realized

that Plaintiff had checked the wrong meter.   (*Id.*)   The two then located the correct meter, which

was in fact leaking gas.   (*Id.* at 192.)   Plaintiff claims that, prior to being called out to the house to

perform the odor investigation, he had been called in to three separate meetings with his

supervisors to discuss his negative performance and the fact that his job was in jeopardy.   (ECF

No. 114-7, Pls.' Resp. to Defs.' First Set of Interrogatories at 19-20; ECF No. 103-1, Bailey Dep.

at 190:23-191:8.)   As a result, Plaintiff was feeling a tremendous amount of stress and was unable

to concentrate.   (*Id.*)

Once Plaintiff's supervisors discovered the November 3, 2011 incident, a pre-disciplinary

meeting was held with Plaintiff on December 7, 2011.   (*See* ECF No. 103-16, Dec. 7, 2011

Meeting Transcript Excerpt.)   At the meeting, Plaintiff admitted to having checked the wrong

meter.   (*Id.* at 3.)   Plaintiff acknowledged that this error created a dangerous situation and that

there was "no excuse" for the mistake, stating that "our job is one that there's no room for errors

like that." (*Id.* at 3.)

The following day, Plaintiff was given a termination letter ending his employment with the

Fire Department.   (ECF No. 103-19, Dec. 8, 2011 Termination Letter.)   Describing the reasons

for his termination, the letter cited Plaintiff's failure to correctly inventory the Fentanyl on his

ambulance on August 1, 2011, and again on September 8, 2011 as well as Plaintiff's failure to

correctly check a gas meter for leaks on November 3, 2011.   The termination letter cited the

remedial training Plaintiff was given and his repeated transgressions despite that training.

## III.   ANALYSIS

"'Congress enacted the [Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.,] in 1990 to remedy widespread discrimination against' persons with disabilities." *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001)) (alterations in original).   The Tenth Circuit reviews ADA claims under the analytical framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).   *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).   Ruling on a motion for summary judgment "[u]nder this framework, the plaintiff has the burden of articulating a prima facie case of discrimination." *Hardy*, 185 F.3d at 1079.   To establish a prima facie case of discrimination under the ADA, Plaintiff must sufficiently show that (1) he is a disabled person as defined by the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was terminated under circumstances which give rise to an inference that the termination was based on his disability.   *Id.* (citations omitted).   Thus, "[i]f [Plaintiff] cannot show that there is a genuine issue of triable fact as to any of the elements of the prima facie case, then the Defendants are entitled to summary judgment." *Koessel v. Sublette Cnty. Sheriffs Dept.*, 717 F.3d 736, 742 (10th Cir. 2013).   Should Plaintiff establish a prima facie case, "[t]he burden of production then shifts to the employer to articulate a legitimate nondiscriminatory reason for taking the adverse action against the plaintiff." *Hardy*, 185 F.3d at 1079 (citations omitted).   Should the employer carry its burden of showing a nondiscriminatory reason, "[t]he burden then shifts back to the plaintiff to present evidence such that a reasonable

jury could conclude that the proffered nondiscriminatory reason for the employment action is

pretextual, that is, unworthy of belief."   *Id.* at 1079-80 (citations and quotations omitted).

The City concedes that Plaintiff satisfies the first element of the prima facie ADA

claim—that he is disabled as that term is defined by the ADA—but argues that Plaintiff has not

presented sufficient evidence to create a triable issue of fact as to the second and third factor.   For

the reasons explained below, the Court agrees.

### A.   Essential Functions

The City argues that Plaintiff was not qualified to perform the essential functions of his job

with or without reasonable accommodations, pointing to several transgressions Plaintiff was cited

for during his tenure with the Fire Department.   Specifically, the City points to instances where

Plaintiff (1) incorrectly inventoried the amount of Fentanyl on the ambulance he was assigned to;

(2) failed to cut the battery cable on a vehicle at an accident site after being directed to do so; and

(3) failed to check the gas meter when responding to an odor investigation, accidentally checking

the electrical meter instead.   The City argues that, even assuming that Plaintiff would be entitled

to reasonable accommodations, he did not provide the City with the necessary documentation to

determine what accommodations would be necessary, nor was he able to perform the essential

functions of his job under the accommodations that were afforded him.   The City further argues

that, as evidenced by Plaintiff's on-the-job mishaps, Plaintiff presented a danger to himself and

others and, for that reason, could not perform the essential functions of his job.

### 1.   Direct Threat

Defendants first argue Plaintiff's ADA claim fails on the grounds that Plaintiff would be

unable to perform the essential functions of his job, with or without a reasonable accommodation, without posing a direct threat to himself, his co-workers and the general public.   Related to the determination of whether an employee is qualified, "[u]nder the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others." *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1291 (10th Cir. 2000) ("A number of courts have ruled that when there is a direct threat to the health or safety of others, a person is not 'otherwise qualified' for employment."); *Justice v. Crown Cork and Seal Co., Inc.*, 527 F.3d 1080, 1091 (10th Cir. 2008).   The term "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."   42 U.S.C. § 12111(3). Equal Employment Opportunity Commission regulations provide that

> [t]he determination that an individual poses a "direct threat" shall be based on . . . a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.   In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.

29 C.F.R. § 1630.2(r).   "Though the burden of showing that an employee is a direct threat typically falls on the employer, 'where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others.'"   *Justice*, 527 F.3d at 1091 (quoting *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004)) (alterations in original).

Here, in terms of the "medical judgment" required under 29 C.F.R. § 1630.2(r), the City's own physician, Dr. Beatty, indicated in a report that Plaintiff did not have any

14

psychological or physiological limitations that would preclude him from performing his job.   (ECF No. 103-6, Mar. 28, 2011 "Fit for Duty Report".)   A separate letter written by Plaintiff's personal physician, Dr. David Kresin, states that Plaintiff was not taking any medications that "would affect the safety of . . . others" and found Plaintiff capable of performing "full unrestricted duty."   (ECF No. 103-17, Apr. 6, 2011 Kresin Correspondence.)   Despite this, however, the evidence shows that Plaintiff was, in fact, a danger.

Plaintiff's job as a fire fighter or paramedic implicates safety considerations inherently.   Despite the medical reports clearing him to work, Plaintiff's conduct while on the job demonstrated significant safety risks.   Plaintiff's failure to recognize or appropriately respond to medical emergencies on September 6, 2011, and August 26, 2011, evidence safety risks to the public.   (ECF No. 103-8, Bailey Performance Documentation at 2-3.)   And no explanation is needed to demonstrate the risks associated with mistaking an electricity meter for a gas meter and thereby failing to discover an active gas leak.

There is no evidentiary support for any contention that reasonable accommodations would have reduced the threat posed by Plaintiff.   Regardless of which shift he worked – a suggested accommodation – the dangers associated with the work of a fire fighter, paramedic or EMT remain.   The stressful and dangerous circumstances that one may encounter in the field are not shift specific.   Plaintiff has completely failed to meet his burden of establishing how his risk-producing conduct would dissipate upon being afforded any particular reasonable accommodation.   Even were this not the case, however,

15

as explained below, Plaintiff's qualification to perform the essential functions of his job

would be lacking.

    2.    <u>Essential Functions and Reasonable Accommodations</u>

The Tenth Circuit has endorsed a two-part analysis to determine whether a person is

qualified to perform the essential functions of his job under the ADA. *Davidson v. Am. Online*,

*Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003) (citing *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1271

(10th Cir. 1998)). "First, the court determines whether the individual can perform the essential

functions of the job. Second, if (but only if) the court concludes that the individual is unable to

perform the essential functions of the job, the court determines whether any reasonable

accommodation by the employer would enable him to perform those functions." *Id*. As with the

other elements of Plaintiff's ADA claim, the Tenth Circuit "place[s] the burden on the plaintiff to

show his qualification for a job . . . which is a mixed question of law and fact." *Koessel v. Sublette*

*Cnty. Sheriffs Dept.*, 717 F.3d 736, 743 (10th Cir. 2013) (citations omitted).

The City points to on-the-job errors made by Plaintiff to show that he was unable to

perform the essential functions of his job, such as Plaintiff's failure to cut the battery cable of a

damaged car at an accident cite and Plaintiff's failure to check a gas meter for leaks during the

course of an odor investigation. Plaintiff, on the other hand, argues that he was able to perform

the essential functions of his job because he "successfully performed as both a firefighter . . . and

[paramedic] for years before he was injured and became depressed" and, prior to his injury,

possessed the necessary experience and training to perform the essential functions of either job.

(ECF No. 114 at 6.) Obviously, Plaintiff's assertion that he could perform the essential functions

of his job *prior* to the onset of his disability does nothing to establish that he could perform those functions to the same degree *after* he allegedly became disabled and his argument is without merit.[1]  The Court finds that the City's significant record of Plaintiff's various transgressions while working as a paramedic and fire fighter is sufficient to show that Plaintiff was unable to perform the essential functions of his job.   The Court must then examine whether Plaintiff could perform those essential functions with the provision of reasonable accommodations.   As to this second factor, the City argues that Plaintiff cannot sustain his burden because he did not provide the City with any documentation demonstrating that he needed an accommodation.   Plaintiff counters arguing that the City, not he, failed to engage in the "interactive process" of determining what accommodations Plaintiff required.   The City further argues that it did provide Plaintiff with various reasonable accommodations, none of which resulted in Plaintiff being able to perform the essential functions of his job.

Under the ADA, if a disabled employee can perform the essential functions of his job with a reasonable accommodation, an employer must provide the employee with such an accommodation.   *Davidson*, 337 F.3d at 1190.   In order to determine what reasonable accommodation is appropriate, "[t]he federal regulations implementing the ADA 'envision an interactive process that requires participation by both parties.'"   *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).   Indeed, "[a]n employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and

---

[1] Confusingly, Plaintiff then contradictorily posits that the "record is clear that [Plaintiff] *could not perform the essential functions of either position* without a reasonable accommodation." (ECF No. 114 at 6) (emphasis added).

the limitations it imposes."   *Id.*

Here, the record reveals that Plaintiff offered nothing to the City in the way of objective medical evidence allowing it to determine what accommodations would enable Plaintiff to perform his job.   In October, 2009, Plaintiff was placed on full-time duty as a paramedic after his physician cleared him to return to active duty.   (ECF No. 27 at ¶ 13.)   In March, 2011, when Plaintiff revealed to Lt. Burley that he was suffering from depression, Plaintiff was taken for an evaluation by the City's physician, Dr. Beatty.   (ECF No. 103-13, Fox Dep. at 66:1-5.)   Dr. Beatty completed a report that did not indicate that Plaintiff had any limitations on his ability to work due to his depression and that his depression was "well controlled with medication."   (ECF No. 103-6, Mar. 28, 2011 "Fit for Duty Report" at 2.)   The City then went further in an effort to properly evaluate Plaintiff's potential need for accommodation, providing Plaintiff with a letter that he could give to his medical providers in order to solicit information relating to his disability and what limitations Plaintiff's condition imposed on his work.   (ECF No. 103-14, Eaton Dep. at 44:1-45:1; ECF No. 103-7, Mar. 30, 2011 Correspondence.)   However, Plaintiff never gave the City any evaluations that were completed by his personal physicians.   Instead, shortly before his termination, Plaintiff indicated that his physician had cleared him to work "full duty."   (ECF No. 103-14, Eaton Dep. at 45:8.)   Plaintiff subsequently produced a letter from his physician in the course of this litigation indicating the same.   (ECF No. 103-17, Apr. 6, 2011 Kresin Correspondence.)   The record is thus devoid of objective medical evidence in the possession of the City indicating that Plaintiff had any restrictions on his ability to work due to his disabilities, and the doctor's report obtained by the City would indicate the contrary.   When the City asked

Plaintiff to provide further information from his personal care providers regarding his limitations, Plaintiff failed to do so.   Plaintiff's "failure to provide medical information necessary to the interactive process precludes [him] from claiming that the employer violated the ADA by failing to provide reasonable accommodation."   *Templeton*, 162 F.3d at 619; *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998) (noting that when the employee "fail[s] to hold up her end of the interactive process by clarifying the extent of her medical restrictions, [the employer] cannot be held liable for failing to provide reasonable accommodations").

In any event, the City has pointed to numerous reasonable accommodations that were provided to Plaintiff.   After Plaintiff complained of "burnout" from his duties as a paramedic and requested to be assigned shifts as a fire fighter, that request was honored and Plaintiff was placed in some shifts as a fire fighter by Lt. Burley.   (ECF No. 103-1, Bailey Dep. at 80:7-11; ECF No. 103-11, Burley Dep. at 115:11 – 116:1.)   After Plaintiff's difficulties performing basic fire fighter duties were observed, Plaintiff was put on light duty, with full pay and benefits, and was provided with additional training.   (*Id.* at 155:2-5; ECF No. 103-13, Fox Dep. at 75:23-25; ECF No. 103-2, Petau Aff. at ¶ 7.)   When Plaintiff eventually returned to his duties as paramedic, the City assigned a veteran paramedic to work with him in order to support him and help him improve his abilities.   (ECF No. 103-1, Bailey Dep. at 159:23-160:23; ECF No. 103-2, Petau Aff. at ¶ 8.) *See Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997) ("[a]dditional training might be a reasonable accommodation" depending on the circumstances).   Despite these efforts to help Plaintiff improve his performance, Plaintiff continued to commit errors.

Plaintiff argues that he requested certain other accommodations that were not granted.

19

Specifically, Plaintiff claims to have requested that he be transferred from B-Shift to his old position on C-Shift and that he be assigned to work as a drive operator engineer, or driver. However, Plaintiff's purported requests for accommodations are either not borne out by the facts in the record or were not reasonable.

Although an employer is obligated to transfer an employee where a different position is available, *Koessel*, 717 F.3d at 745, the record indicates that Plaintiff never explicitly requested to be transferred to C-Shift at any time after he was transferred to B-Shift.   To the contrary, in a disciplinary meeting with Plaintiff and his supervisors on October 13, 2011, Plaintiff was directly asked about his status working on B-Shift and affirmed his desire to stay on that shift.   (ECF No. 103-15, Oct. 13, 2011 Meeting Transcript Excerpt; *see also* ECF No. 103-1, Bailey Dep. at 122:2-4.)   Further, nothing in the record indicates that Plaintiff's disability would be better accommodated if he were transferred to C-Shift.   To the extent Plaintiff desired to be transferred to C-Shift merely because he did not like his manager in B-Shift, this would not be a legitimate reason for such an accommodation.   *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996); *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996) (failure to assign employee to work under different supervisor did not violate reasonable accommodation requirement of ADA).

As to Plaintiff's request that he be accommodated by being placed into the position of driver, this is not a reasonable accommodation because it would be considered a promotion. (ECF No. 103-11, Burley Dep. at 52:2-12.)   *Koessel*, 717 F.3d at 745 ("employers need not promote an employee when they reassign him . . . [but] are required to consider only lateral

transfers or, if none are available, demotions").   In any event, there is no evidence in the record showing that a driver position was even available.   *Id.* ("employers are only required to reassign employees to existing vacant positions").   Instead, the record shows that Plaintiff was temporarily assigned to driver while the regular driver was out on leave.   When the regular driver returned to full time duty, he resumed his position as driver and Plaintiff was returned to his original duty as paramedic.

Based on the foregoing, Plaintiff has not sustained his burden of establishing the second element of a prima facie ADA claim, in that he has not demonstrated the existence of a triable issue of fact as to whether he could perform the essential functions of his job as fire fighter or paramedic, with or without reasonable accommodations.

### B.    Termination Based on Disability

The third element of the prima facie ADA claim requires that Plaintiff "present some affirmative evidence that disability was a determining factor" in the City's decision to terminate his employment.   *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).   Plaintiff's burden in this regard is "'not onerous,' but it is also 'not empty or perfunctory.'"   *Id.* (quoting *Morgan*, 108 F.3d at 1323). If Plaintiff is able to meet this burden, it then "shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action." *Id.* (citing *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 747 (10th Cir. 1999).   Should the City succeed in articulating such a reason, the burden then shifts back to Plaintiff to show that the City's purported reason "is merely a pretext for unlawful discrimination on the basis of [his] disability."   *Id.* (citing *Butler*, 172 F.3d at 747).

Although analysis of this factor is not required in this case in light of Plaintiff's failure to satisfy the second element, the Court will nonetheless engage in the analysis as it affords an additional grounds for granting the summary judgment motion.   Considering Plaintiff's argument that his disability was a determining factor in the City's decision to terminate his employment, the Court finds that, arguendo, Plaintiff has presented sufficient evidence to establish a material issue of fact, noting that his burden at this stage is "not onerous." *Selenke*, 248 F.3d at 1259.   Thus, the burden now shifts to the City to offer a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.   In support, the City offers the letter that was provided to Plaintiff on the day he was fired, which explains several instances of Plaintiff's poor performance that led the City to its decision.   (ECF No. 103-19, Dec. 8, 2011 Termination Letter.)   Specifically, that letter states that the City decided to terminate Plaintiff's employment based on his failure to correctly inventory the Fentanyl on his ambulance on two occasions in a one month period and the occasion when Plaintiff accidentally checked an electric meter when he was instructed to check a gas meter for leaks.   (*Id.*)   The letter further cites to the remedial training that Plaintiff was given in an attempt to bring him back to a performing capacity and Plaintiff's repeated failure to meet the Fire Department's standards in spite of that training.   The Court finds that this evidence is sufficient to sustain the City's burden; that burden now shifts to Plaintiff to demonstrate that the City's proffered reasons for Plaintiff's termination are mere pretext.

Plaintiff points to the fact that other paramedics had committed the same error when performing inventory checks on their respective ambulances yet had not been disciplined for the error, citing an internal email among Plaintiff's supervisors where it is noted that "many of our

22

medics have committed a similar offense in the past several years and, to my knowledge, have not suffered any discipline for a similar neglect of duty." (ECF No. 114-10, Oct. 11, 2011 Email.) In the context of an ADA claim, "[a] satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to violation of a work rule could . . . len[d] support to the pretext argument." *Morgan*, 108 F.3d at 1324; *see also Smothers*, 740 F.3d at 541 ("When comparing different treatment of similarly-situated employees . . . the violations need only be of comparable seriousness.") (citations omitted).

Taken in isolation, the Court might agree that the City's decision to fire Plaintiff based solely on his failure to correctly inventory drugs would be a good indicator that this reason was pretextual. However, the City's reasons for firing Plaintiff were not based exclusively on Plaintiff's difficulties inventorying drugs but were manifold, as described in the letter provided to Plaintiff on the day of his termination. (ECF No. 103-19, Dec. 8, 2011 Termination Letter.) That letter cites to his failure to check a gas meter for leaks, instead checking the electric meter, as one of the reasons for his termination. The letter also records the various attempts to provide Plaintiff with remedial training in an effort to bring his performance back up to satisfactory standards and Plaintiff's repeated transgressions despite that training. The record before the Court is also replete with other instances, dutifully recorded by the Fire Department, where Plaintiff's performance was inadequate. These issues, when viewed as a whole, justify the City's conclusion that allowing Plaintiff to remain in his position could create future liability for the City, as future mishaps by Plaintiff could lead to Plaintiff's own injury, the injury of his co-workers or the injury of members of the public. (*See* ECF No. 114-16, Nov. 30, 2011 Email.) The City's

reasoning is confirmed in an internal email among Plaintiff's supervisors, stating that the multiple

negative reviews Plaintiff received show that Plaintiff "poses a serious risk to himself, his

co-workers, and the community in his role as an emergency responder."   (*Id.*)   Indeed, the email

Plaintiff cites to for the proposition that he was treated differently from other employees who

similarly failed to properly inventory drugs specifically concludes that, based only on this one

transgression, that Stovall was "not in favor of termination, at this time."   (ECF No. 114-10, Oct.

11, 2011 Email.) (emphasis removed).   It was only later, after numerous, more severe instances of

Plaintiff's inability to perform were documented and viewed as a whole, did the City make the

determination that it would be required to terminate Plaintiff's employment.   Plaintiff has not

satisfied his burden of demonstrating that the City's legitimate reasons for his termination were

mere pretext. [2]

## IV.   CONCLUSION

Based on the foregoing, it is ORDERED that Defendant's Motion for Summary Judgment

(ECF No. 103) is GRANTED.   The Clerk of the Court is directed to enter JUDGMENT in

Defendant's favor.

---

[2] The fact that Pattarozzi, one of Plaintiff's supervisors who was responsible for terminating his employment, also suffered from depression himself would tend to "undermine[] any suggestion of pretext."   *Estate of Bassatt v. School Dist. No. 1 in the City and Cnty. of Denver, et al.*, 775 F.3d 1233, 1241 (10th Cir. 2014) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (plaintiff failed to show pretext in part because decision makers were in the same protected class as plaintiff))

DATED this 10th day of July, 2015.

BY THE COURT:

_____

RAYMOND P. MOORE
United States District Judge